**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

SIDI OTHMAN NACIRI MAJD,

        Plaintiff,

  vs.                                      No. CIV 10-44 JCH/LFG

WARDEN TERRY, et al.,

        Defendants.

## MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

### Introduction

THIS MATTER is before the Court both *sua sponte* under 28 U.S.C. § 1915(e)(2) and Rule 12(b)(6) of the Federal Rules of Civil Procedure, and on the Motions for Summary Judgment under Rule 56 of the Federal Rules of Civil Procedure, filed by Defendants on Plaintiff's civil rights complaint. Plaintiff Sidi Othman Naciri Majd ("Majd") is incarcerated, appears *pro se*, and is proceeding *in forma pauperis*.

The Court has the discretion to dismiss an *in forma pauperis* complaint (or claim) *sua sponte* under § 1915(e)(2) "at any time if . . . the action . . . is frivolous or malicious; [or] fails to state a claim on which relief may be granted. In reviewing Majd's complaint and related pleadings, the

---

[1] Within fourteen (14) days after a party is served with a copy of this legal analysis and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the fourteen-day period allowed, *i.e.,* by May 23, 2011, if Majd wants to have appellate review of the analysis and recommendations. If no objections are filed, no appellate review will be allowed.

Court applies the same legal standards applicable to pleadings drafted by counsel but liberally construes the allegations. *See* Northington v. Jackson, 973 F.2d 1518, 1520-21 (10th Cir. 1992).

In making the recommendations discussed below, the Court reviewed Majd's complaint, brought under 42 U.S.C. § 1983, that consists of two form complaints filed as one document. The form complaints are essentially the same, naming Defendants Warden Ray Terry ("Warden Terry") and Assistant Warden Karl Frawner ("Assistant Warden Frawner" or "Defendants"). [Doc. 1.] Both complaints assert the same violations of Majd's constitutional rights by Warden Terry and Assistant Warden Frawner while Majd was held as an immigration detainee at Otero County Processing Center ("OCPC"). [Docs. 1, 7.] In addition to the complaint [Doc. 1], the Court reviewed Majd's "Brief" with exhibits, filed January 3, 2011 [Doc. 14], which appears to re-state the same claims and provide a little more detail as to the allegations.

The Court also reviewed Defendants' Motion for Summary Judgment [Doc. 18], filed on January 19, 2011, along with the Martinez report [Doc. 17], a supplemental Martinez report [Doc. 22], and a supplemental Motion for Summary Judgment [Doc. 26.] The Court allowed Majd an extension until March 31, 2011, to respond to the original and supplemental Martinez reports, and the original and supplemental motions for summary judgment. On March 31, 2011, Majd filed a response with exhibits. [Doc. 28.] On April 28, 2011, Defendants filed a reply. [Doc. 30.] In recommending that Majd's complaint be dismissed, the Court carefully considered the pertinent law and all of the pleadings and exhibits.

**Factual and Procedural Background**

Majd, a citizen of Morocco and a Muslim, was an immigration detainee at OCPC from March 2009 until his release from the facility on May 14, 2010. [Doc. 18, ¶ 1.] Since his release from custody, Majd resides in Hartford, Connecticut. [Docs. 6, 12.]

Majd's specific allegations of civil rights violations, as set forth in the complaint and supplemental brief, are as follows:

> (1) In April 2009, Majd was illegally strip searched along with other detainees, in an atmosphere of "yelling, screaming, humiliation and torture" "in the presence of Defendant Terry;" [claim 1]
>
> (2) The meals Majd was served were "cold, and were not Halal as is required by his [Muslim] religion beliefs and by the NDS standards and the First Amendment of the Constitution." Majd contends that Defendants Terry and Frawner responded to his complaints by saying that cold meals were allowed by ICE/NDS and that "you choose your religion;" [claim 2]
>
> (3) Majd was not allowed to perform his religious prayer at night on many occasions as officers interrupted his prayers. Officers told Majd he could not pray in the dorm, where he was housed, after 10:30 p.m.; [claim 3] and
>
> (4) Majd was forced to use "wide open bathrooms and showers with no privacy" which failed to provide the bodily privacy required by his religious beliefs. [claim 4]

[Docs. 1, 14.]

Regarding whether Majd exhausted administrative procedures [Doc. 1, p. 5], Majd stated he had "complained, [had] written the captain, chaplain himself and wardens, complaints but in vain." Attached to Majd's complaints [Doc. 1] are a number of written detainee requests to staff members submitted by Majd relating to food that was served. Attached to Majd's "brief" [Doc. 14] is an inmate grievance from by Majd complaining about conduct of "Officer Ramirez" who Majd claimed was "very rude, disrespectful, and provocative," as well as "prejudiced" against Muslims. The

3

grievance asserts that Officer Ramirez interrupted prayer services and threatened Majd. [Doc. 14.] Majd also attached sworn statements by four detainees who signed typed forms stating they were victims and had witnessed the "Civil Rights violation committed by the Employees under direct control of the defendants." These statements did not describe any type of specific alleged civil rights violation, nor did the detainees assert they had witnessed an illegal strip search. [Doc. 14, attachments.] Majd also included copies of 2008 "ICE/DRO Detention Standard(s)" relating to food service. [Doc. 14.]

Majd's complaints request an award of damages in the amount of $30,000,000. [Doc. 1.] His "brief" seeks injunctive relief. [Doc. 14, p. 4.] On November 8, 2010, Defendants filed their Answer. [Doc. 12.]

For the reasons given below, the Court recommends, under 28 U.S.C. § 1915(e)(2) and Fed. R. Civ. P. 12(b)(6) that claim 1 (illegal strip search) be dismissed, with prejudice, for failure to state a claim against Defendants Terry and Frawner. Majd, however, will be allowed fourteen (14) days to file an amended complaint with respect to the alleged strip search if he can allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

Regarding claims 2-4 (alleged religious discrimination) the Court finds Majd failed to raise a genuine issue of material fact under Fed. R. Civ. P. 56. Thus, the Court recommends that Defendants' Motions for Summary Judgment be granted and that claims 2-4 be dismissed, with prejudice.

## **Analysis**

Defendants concede that exhaustion of administrative remedies is not an issue in this case because Majd, as an immigration detainee, is not required to meet the exhaustion requirements of

the Prison Litigation Reform Act ("PLRA"). [Doc. 17, p. 2.] *See* Cohen v. Clemens, 321 F. App'x 739, 743 (10th Cir. 2009) ("the provisions of the PLRA do not apply to Cohen, because he is an alien detainee in immigration custody, and not a 'prisoner' under the statute") (unpublished). Thus, the Court proceeds to an analysis of Majd's claims.

Claim 1:  Strip Search

Under § 1983, government officials are not vicariously liable for the misconduct of their subordinates. There is no concept of strict supervisor liability under § 1983. Jenkins v. Wood, 81 F.3d 988, 994 (10th Cir. 1996). To succeed on a claim brought under 42 U.S.C. § 1983, Majd must allege some personal involvement by each defendant in the alleged constitutional violations. Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009) ("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation.") (citation omitted). In other words, Majd must allege that Warden Terry and/or Assistant Warden Frawner were personally involved or that they personally participated in the alleged strip search.

Naming the highest officials in the chain of command as defendants is insufficient to show supervisory liability under § 1983. To establish a supervisor's liability under § 1983, "a plaintiff must not only 'show the supervisor's subordinates violated the constitution,' but also that 'an affirmative link' exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise. . . ." Hook v. Regents of Univ. of Calif., 394 F. App'x 522, 536 (10th Cir. Sep. 13, 2010) (unpublished) (*citing* Fogarty v. Gallegos, 523 F.3d 1147, 1162 (10th Cir. 2008)). *See also* Trujillo v. Williams, 465 F.3d 1210, 1227 (10th Cir. 2006) ("[i]n order for liability to arise under § 1983, a defendant's direct personal responsibility for the claimed deprivation of a constitutional right must be established); Novitsky v. City of Aurora, 491 F.3d 1244, 1254 (10th Cir. 2007) (requiring defendant to have "personally

5

participated" in the constitutional violation and holding that mere presence at the scene was insufficient); Thomas v. Guffey, 367 F. App'x 957, 959 (10th Cir. Mar. 2, 2010) (finding complaint did not provide required affirmative link; the plaintiff's allegations that defendants were liable simply because their positions made them responsible was insufficient to state a claim under § 1983) (unpublished); Starks v. Lewis, 313 F. App'x 163, 167 (10th Cir. Feb. 23, 2009) (not enough for a plaintiff to show a defendant was in charge of other actors who committed a violation; under § 1983, supervisors must be personally involved in the constitutional violation and a sufficient causal connection must exist between supervisor and alleged deprivation) (unpublished).[2]

The Court acknowledges that supervisory liability might exist even without personal participation in the constitutional deprivation if supervisory officials implemented a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation. Dodds v. Richardson, 614 F.3d 1185, 1200 n.8 (10th Cir. 2010) (internal citation omitted), *cert. denied,* __ S.Ct. __, 2011 WL 1529753 (Apr. 25, 2011). Here, however, the question of policy does not arise as nowhere in Majd's pleadings did he allege the existence of a deficient policy regarding alleged strip searches.

Majd alleges that Defendant Warden Terry and Assistant Warden Frawner were present at the strip search or were aware of it. This simply is insufficient to state a claim. Mere presence or awareness does not constitute the requisite personal participation. Novitsky, 491 F.3d at 1254.

---

[2]As noted recently by the Tenth Circuit Court of Appeals in Hook, 394 F. App'x at 536 n.10, the United States Supreme Court's decision in Ashcroft v. Iqbal, ___ U.S. ___, 129 S.Ct. 1937 (2009), "generated significant debate about the continuing vitality and scope of supervisory liability . . . in § 1983 suits . . . ." Indeed, "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit . . . ." Dodds v. Richardson, 614 F.3d 1185, 1200 (10th Cir. 2010). Regardless of how Iqbal is read as to the viability of supervisory liability, it did not alter the "previously enunciated § 1983 causation and personal involvement analysis." Id.

In addition, Majd's conclusory and self-serving allegations of personal participation by Defendants are belied by internal contradictions throughout Majd's pleadings. For example, in the form complaint [Doc. 1, p. 2], Majd stated that he was "searched illegally by M.T.C. staff who told me and my fellow detainees to take all our clothes off and face the walls in an atmosphere of yelling, humiliating and screaming in our faces." Majd further alleged that "[a]ll M.T.C. staff was present . . . ." The detainees were required to face the walls "while 20 to 30 other officers including (lieutenants, sergeants, correctional officers in the presence of Warden Terry on this day of 4-09-09 [sic]." In the same complaint [Doc. 1, p. 3], Majd stated that the strip search occurred on "4-08-09" and that he "was strip searched . . . by female officers . . . ."

In the second form complaint [Doc. 1, pp. 9-10], Majd summarily alleged that "[t]hey illegally strip-searched me and my fellow detainees . . . ." [Doc. 1, p. 10.] The second form complaint asserts that the strip search occurred on April 8, 2009 rather than April 9, 2009. [Id.] Majd contended again that he was searched illegally by "M.T.C. staff." "All M.T.C. Staff was present at the time of the incident . . . ." [Id.] "[A]ll officers were yelling and screaming at us and correctional officer Pineda was yellingly [sic] telling us to lift up our feet while facing the walls. 20 to 30 officers including (lieutenants, sergeants, correctional officers and trainees in the awareness of Warden Terry on this day of 04-15-09.[)]" [Id.]

Thus, in the complaint alone [Doc. 1], Majd asserts three different dates for the alleged strip search – April 8, April 9, and April 15, 2009. His contentions as to who was present and how many officers were present differ – "all M.T.C. staff" was present for the alleged search, "20-30 officers" were present, and only "female officers" strip searched him.

Majd's typewritten "brief," filed in January 2011 [Doc. 14], reveals more internal inconsistencies. He again described the alleged strip search [this time occurring on April 9, 2009]

7

by "MTC staff," but without alleging any personal participation by Defendants. Instead, he summarily stated that the "actions" of Defendants violated his right to privacy and his right to be free from an unreasonable search and seizure. [Doc. 14, p. 2.] Such conclusory and general allegations are insufficient to provide the "'an affirmative link' between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise. . . ." *See* Fogarty, 523 F.3d at 1162.

Majd's response to the Martinez report further removes Defendant Terry from the alleged scene and fails to mention Assistant Warden Frawner at all. [Doc. 28.] In the response, Majd provided a sworn affidavit of a fellow detainee, Orville Murphy.³ Murphy alleged that the strip search occurred on April 9, 2009, when "a number of officers came to our dorm . . . and started yelling and banging on metal devices . . . ." [Doc. 28, Murphy Aff. at ¶ 4.] Murphy further attested that 20 or 25 officers charged at the detainees and commanded them to take off their clothes and stand up against the walls. [Id., at ¶ 15.] Every detainee, according to Murphy, had to remove his clothes in front of male and female officers. [Id., ¶ 15.]

> Eventually upon our return to our original pod . . ., Majd and I and some other detainees request [sic] to talk to the Warden. An hour later, Warden terry [sic] arrived at the pod and we told him what happened while racked up. Warden terry did not do or say anything about the strip search to the officers, even though Majd and I complained about the matter to him directly.

[Id. at ¶¶ 17, 18.]

---

³Mr. Murphy's similar strip search claim, brought in a separate lawsuit, was also dismissed, in part due to Murphy's failure to allege personal involvement by the supervisory defendant in the alleged constitutional violation. Murphy v. Warden Terry, et al., No. CIV 09-907 MV/LAM [Doc. 27, p. 9; Doc. 28] (D.N.M. Sep. 13, 2010) (unpublished).

Similarly, Majd's response confirms that Warden Terry was not present during the alleged strip search. Instead, Majd and other detainees purportedly sought to address the issue *later* with Defendant Terry.

> In fact, the plaintiff and the rest of the detainees in the dorm insisted to talk to the waren [sic] who eventually appeared at the dorm personally and having addressed him from their 'Bunks' since everyone was on lockdown, plaintiff and Orville Murphy . . . tried to get the warden's attention which to comlain [sic] about the strip-search but Mr. Terry said he had other things to attend to and all simply just ordered the dorm officer to lift the lock down off and send all deteinees [sic] to the mess-hall without apologizing on behalf of his staff for their unprofessional behavior or even addressing the issue of the illegal strip-search. Plaintiff and other detainees bearing in mind that since Warden Mr. terry is the top of the chain of command there was no need to file a grievance . . . .

[Doc. 28, pp. 1-2.] In this pleading, Majd, along with Murphy, clarified that Defendant Warden Terry was not present during the alleged strip search, did not personally participate in it, and did not exercise control over the alleged search. Thus, Majd contradicts his own allegations in the complaints [Doc. 1] that Warden Terry was present during the alleged strip search. Even if Majd complained to Warden Terry as alleged and the warden failed to take any action, the law is clear that the denial of a formal grievance (whereas here, there was only an alleged informal, verbal complaint), regarding the alleged strip search, is not sufficient to show personal participation by Terry. *See* Gallagher, 406 F. App'x at 317-18 (mere denial of grievances does not constitute "personal participation" that will support a cause of action under § 1983).

In addition, once again, there are no allegations that Assistant Warden Frawner was present for, aware of, or a participant in the alleged incident. Majd failed to show any "affirmative link" between Defendants' alleged actions or inactions and the purported constitutional deprivation. Thus, Majd fails to state a claim under Fed. R. Civ. P. 12(b)(6). Accordingly, the Court recommends

9

dismissal of the claim, with prejudice, under 28 U.S.C. § 1915(e)(2) as to these Defendants.[4] Should Majd be able to assert the alleged strip search claim against defendants who personally participated in the alleged deprivations, Majd will be allowed fourteen (14) days to file an amended complaint with respect to this claim only. Any amended complaint must be consistent with the analysis of Majd's claim herein. In other words, Majd must allege personal participation and the required affirmative link between a defendant's actions and the alleged deprivation.

Claim 2: Religious Discrimination

Prisoners retain their constitutional rights while incarcerated, including the right to freedom of religion. Cruz v. Beto, 405 U.S. 319, 322-23 (1972); LaFevers v. Saffle, 936 F.2d 1117, 1118-19 (10th Cir. 1991). However, a prison regulation that burdens an inmate's constitutional rights is valid if the regulation is reasonably related to legitimate penological interests. Turner v. Safley, 482 U.S. 78, 89 (1987).

To establish a violation of his right to freely exercise his religious views, Majd must satisfy the "reasonableness test" set forth in Turner, 482 U.S. at 89, and O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987). Under these cases, when a prison regulation encroaches upon a prisoner's rights to free exercise of his religion, the regulation is valid if it is reasonably related to a legitimate penological interest. *See id*. Thus, Majd must demonstrate that OCPC's alleged curtailment of his religious views or rights was not reasonably related to a legitimate penological interest.

In addition, an inmate's right to privacy, while not vanishing altogether, must yield to the penal institution's need to maintain security. Cumbey v. Meachum, 684 F.2d 712, 714 (10th Cir.

---

[4] While Defendants did not argue that dismissal of the strip search claim was appropriate because of Majd's failure to show personal participation, the Court has the discretion *sua sponte* to recommend dismissal of a claim brought in an *in formal pauperis* complaint at any time, if the Court determines Plaintiff failed to state a claim upon which relief may be granted. 28 U.S.C. § 1915(e)(2).

10

1982) (citation omitted). However, an inmate's limited right to privacy may be violated where prison officials regularly watch inmates of the opposite sex shower. Id.

Majd asserts three separate religious discrimination claims related to his Muslim faith.

### A.   *Halal Food/Common Diet*

Majd alleges that he was never served "Halal food" which is mandatory in his religion, while Jewish inmates were always provided "Kosher" food. [Doc. 1.] He complains that the food served at OCPC was not Halal because it was not blessed by a Muslim person. [Doc. 14, p. 2.] He also contends that his food was served cold. [Doc. 1.] Majd alleges that Defendants responded to his complaints by stating special diet meals are not supposed to be served hot and that food items are not to be cooked. In his brief [Doc. 14], Majd contends that he included sworn statements of detainees who worked in the OCPC kitchen and swore they never saw or served Halal food to Muslim detainees because it was not provided or purchased by prison officials. [Doc. 14, pp. 2-3.] No such statements were attached to any of Majd's pleadings, other than statements by five individuals who generally averred that they witnessed civil rights violations. [Doc. 14, Attachments.]

In 2009 and 2010, Majd submitted a number a written complaints concerning issues with food or meals. He complained that the rations were too small and that inmates received the same food over and over. He also complained in writing a number of times about not receiving Halal food while Jewish inmates were served Kosher meal, and that the food Majd received was cold. Typically, the facility responded that it was providing food that met standards for the Bureau of Prisons or INS. In addition, prison officials stated that "common fare" was not required to be cooked in accordance with ICE standards.

In their Martinez report, Defendants state that inmates with religious dietary restrictions are offered the "Common Fare" diet. [Doc. 17, p. 4; Doc. 18, ¶ 7.] This diet is approved by ICE,

Immigration and Naturalization Service ("INS"), and the Federal Bureau of Prisons and is noted to accommodate a wide variety of religious dietary restrictions. [Doc. 17, p. 4; Doc. 18, ¶ 8.] Frawner states in his Affidavit that MTC strictly adheres to the requirements of the INS's Detention Standard concerning food service.  Pertinent portions of the Detention Standard provide that: "[t]he INS requires all facilities to provide detainees requesting a religious diet reasonable and equitable opportunity to observe their religious dietary practice within the constraints of budget limitations and the security and orderly running of the facility through a common fare menu." [Doc. 17, Ex. B, pp. 14-15.] The policy also note that "[t]o the extent practicable, a hot entree shall be available to accommodate detainees' religious dietary needs, e.g., kosher and/or halal products. Hot entrees shall be offered three times a week and shall be purchased precooked, heated in their sealed containers, and served hot." [Doc. 17, Ex. B, p. 16.]

Moreover, the OCPC's food service was audited by an outside auditor in March, April, and May 2009, with the result that OCPC received high marks. [Doc. 17, Frawner Aff. at ¶ 7; Ex. C] "The audits demonstrate that food service personnel are well-trained, qualified, sanitary, and sensitive to issues of ethnic and religious diversity. The audit also confirms that detainees are served hot food at least two times per day." [Id., at ¶ 7.]

Frawner states further that Majd requested and received the Common Fare diet. [Frawner Aff., at ¶¶ 6, 9.] He complained about the meals, sending several staff requests to voice his concerns. In response to the concerns, MTC explained that the facility followed INS and Federal Bureau of Prisons Guidelines for the Common Fare diet. [Doc. 17, Frawner Aff., at ¶ 9.] Majd also requested that a program be established for special meals on Fridays and religious holidays. MTC stated in response that it was making arrangements to satisfy his requests. However, on November 6, 2009,

Majd requested that his special diet accommodation be terminated, and the facility granted his request. [Doc. 17, Ex. E.]

While Majd filed several staff requests regarding his concerns with food service to which the facility responded [Doc. 17, Ex. E], he filed no grievances. The Court finds no genuine issue of material fact as to whether Majd's rights as a Muslim were interfered with or impeded by OCPC officials with respect to his meal service. Although Majd complains about the quality and temperature of the food, along with the rations and selections, he does not dispute that he was provided with Common Fare meals that met federal standards for religious dietary standards. Thus, the Court accepts Defendants' Undisputed Facts [Doc. 18, ¶¶ 7-12]. Based on these undisputed facts, Majd's complaints that he was not given Halal food or that his food was cold or not cooked do not rise to the level of religious discrimination or a constitutional violation. Therefore, the claim must be dismissed.

### B. *Religious Services/Practices*

Majd asserts that "officers always interrupt our religious service on Fridays purposely in the pretext that they need to do recounts always. They put our religious leader in solitary confinement for 30 days twice for complaining about this issue." [Doc. 1, p. 2.] Majd alleges that he was harassed several times by officers who ordering him not to pray in the corner of the dorm and told him that he could not pray after 10:30 p.m. [Doc. 1; Doc. 14.]

Majd submitted a number of complaints in writing about prayer services being interrupted and officers who were "abusive, provocative, rude, and disrespectful." In particular, Majd complained that Officer Ramirez should not be permitted to attend Muslim services because he was rude, threatening, and disrespectful. [Doc. 17, Ex. F.] On March 15, 2010, Majd filed a grievance complaining about Officer Ramirez's behavior at Muslim services. [Doc. 14, exhibit; Doc. 17, Ex.

F.] OCPC officials responded by stating that upon arrival, detainees, including Majd, read and signed the detainee handbook stating that he must follow and obey all rules given to him and that count times were "extremely important" to the facility [Id.] In addition, OCPC stated that the decision to assign an officer for specific duties could not be made by detainees.

Prison officials also received complaints by Muslim inmates that female corrections officers should not be in the prayer services. [Doc. 14, Exhibits; Doc. 17, Ex. F.] Majd asked for an investigation into his complaints.

According to Frawner, MTC conducted an investigation into Majd's complaint, which resulted in four memoranda being prepared by a staff supervisor, two shift supervisors and the Captain of Otero II. Based on the investigation, the facility determined that Majd was improperly attempting to dictate MTC staffing and that he and some other Muslim detainees refused to continue their religious service despite having the opportunity to do so. [Doc. 17, Frawner Aff., at ¶ 10.]

Defendants attached the applicable INS Detention Standard to their Martinez report, addressing the religious practices policy. That policy states in pertinent part that "[d]etainees of different religious beliefs will be provided reasonable and equitable opportunities to participate in the practices of their respective faiths." "Opportunities will be constrained only by concerns about safety, security, the orderly operation of the facility, or extraordinary costs . . . ." [Doc. 17, Ex. G.] The policy further provides that "[d]etainees will have the opportunity to engage in-group religious activities, consistent with the safe, secure and orderly operation of the facility." [Doc. 17, Ex. G, p. 4.]

Frawner testified in his affidavit that MTC did not create the INS Detention Standard concerning religious practices but is required to and does adhere to it. [Doc. 17, Frawner Aff., at ¶ 11.] In addition, an outside auditor conducted an audit of OCPC regarding its adherence to the INS

14

standards for religious practices in April and May 2009, and found them in compliance with the policy and standards. [Doc. 17, Ex. H.]

Moreover, MTC has an internal policy regarding religious programs that was taken from the American Corrections Association ("ACA') Standards.  It states that OCPC's policy is to allow religious freedom to all detainees in the practice of their chosen religion.  Coordination of religious services is conducted by the Chaplain of the facility.  According to Frawner, OCPC adhered to his internal policy. [Doc. 17, at ¶ 13; Ex. I.]

Majd's allegations concerning Muslim services and the complaints about certain officers in attendance do not amount to evidence of religious discrimination or constitutional violations.  Instead, Majd was improperly attempting to dictate which officers could attend services within a prison facility.  Majd fails to raise any genuine issues of material fact sufficient to demonstrate that Defendants unlawfully violated policy, interfered with religious practices, or discriminated against him in any manner.  Therefore, the religious practices claim must be dismissed.

          C.     *Privacy during Bathing*

Majd contends that the bathrooms and showers are "wide open," precluding any form of privacy.  "We Muslims have to have our privacy in the shower and bathrooms." [Doc. 1, p. 2.] Female guards allegedly made visual checks of the dorm areas, including the showers and bathrooms. [Doc. 14, p. 4.] Majd further alleges that "[f]ew female guards, but mostly male, were assigned monitor the housing areas of detainees . . . ." [Doc. 14, p. 4.] "But the shower and bathroom areas . . . are all 'open' with no closing doors to provide privacy to detainees and exposing them to whoever is using the showers and bathrooms at the same time along [sic]. FEMALE GUARDS MADE VISUAL CHECKS OF THE DORM AREAS INCLUDING THE SHOWERS AND BATHROOMS." [Doc. 14, p. 4] (emphasis in original).

Defendants were asked to respond to these allegations in the supplemental Martinez report since the original Martinez report omitted any discussion of this claim. The supplemental Martinez report described the physical layout of the shower area where Majd was housed and provided a drawing of that area. The shower area was constructed on design criteria of Immigration and Customs Enforcement and conforms with both National Detention Standards and American Corrections Association requirements. [Doc. 25, Ex. A, Warden Terry Aff., at ¶¶ 3, 5.] Warden Terry's affidavit and the drawing indicate that the shower and restroom area are surrounded by a modesty wall that is about four feet high. The opening at one end of the wall allows access into the shower area. A ten-foot high wall separates the toilet area from the shower area. There are five showers in each shower area. In four of the shower areas there are two handicap showers, each of which has two extra walls that extend from the back wall about three feet out and which are ten feet high. [Id., at ¶ 3.]

According to Warden Terry, the modesty wall allows a detainee to shower "with a reasonable amount of privacy." Some detainees elect to wear their underwear into the shower for personal reasons which is permitted. [Id., at ¶ 4.]

Because of concerns about safety and security of detainees from sexual assault (*e.g.,* preventing harm to detainees by others and also from harming themselves), the shower areas must be visible to OCPC personnel. Warden Terry provided sworn testimony that historically, shower areas in detention facilities are a common location for occurrences of harm or injuries to detainees. [Id., at ¶¶ 6, 7.] OCPC must and does operate in accordance with the Prison Rape Elimination Act, which requires prison administrators to take reasonable steps to not allow any condition to exist in a facility that might facilitate sexual abuse of a detainee. Accordingly, the facility cannot provide hidden places, like totally private showers, where detainees could be physically harmed.

16

Notwithstanding concerns for safety, Warden Terry testified that the shower areas at OCPC afford detainees with a reasonable amount of privacy. For example, the modestly wall in the shower area and tall wall between showers and the toilet area are designed as a compromise between the desire for privacy and the facility's need for maintain the safety of detainees. [Id., ¶ 8.]

It is clear that OCPC has legitimate concerns as to the safety and security of inmates while they are in the shower/bathroom area, and that limitations in privacy are based on those legitimate institutional concerns. Moreover, Majd did not provide any specific evidence as to how many occasions, if any, female guards observed him in the nude while showering. Instead, his allegations are general and conclusory in nature.

In addition, Majd, a detainee who voiced many complaints while at OCPC, did not file a single grievance that his rights of privacy were violated by female guards viewing him while showering. Majd made no complaints about a lack of privacy in the shower area and submitted no grievances concerning such concerns. [Doc. 25, Warden Terry Aff., at ¶ 9.] Instead, Majd's single complaint about the showers concerned water that was not sufficiently hot. [Id.]

Further, it is worth noting that Majd requested volunteer work on the Shower Squad and served in that position while at OCPC. [Id., at ¶ 10; Doc. 25, Ex. 4.] Majd, therefore, had significant exposure to the shower areas and yet submitted no grievances related to privacy concerns.

The Court finds no genuine issue of material fact exist with respect to Majd's claim that his privacy rights were violated by OCPC's policies or practices in monitoring Majd's showering. Therefore, this religious discrimination/privacy violation claim must also be dismissed.

## Conclusion

The Court finds that Majd's strip search allegations fail to state a claim, and recommends that claim be dismissed against Defendants Terry and Frawner, with prejudice. The Court further

finds no genuine issue of material fact as to the three religious discrimination claims and recommends that summary judgment be granted in favor of Defendants, with the result that the three religious discrimination claims be dismissed, with prejudice.

### **Recommended Disposition**

(1) That claim 1 (alleged strip search) be dismissed, with prejudice, as asserted against Defendants Terry and Frawner, and that Plaintiff Majd be permitted 14 days to file an amended complaint as to that claim, to the extent he can do so consistent with the analysis in this opinion;

(2) That Defendants' Motions for Summary Judgment [Doc. 18, 25] be granted with respect to claims 2, 3 and 4 (alleged religious discrimination), and that those three claims be dismissed with prejudice; and

(3) That Majd's complaint and this action be dismissed, with prejudice.

_____
Lorenzo F. Garcia
United States Magistrate Judge